**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

LEE C. REEVES,

   Petitioner,

     v.

THE ATTORNEY GENERAL OF
THE STATE OF NEW JERSEY, et al.,

   Respondents.

---

Civ. No. 20-7482 (RK)

<u>**OPINION**</u>

**<u>KIRSCH, District Judge</u>**

  **THIS MATTER** comes before the Court upon Petitioner Lee C. Reeves's ("Petitioner" or "Russell"), a state prisoner appearing *pro se* in this habeas proceeding under 28 U.S.C. § 2254, challenge of his conviction and sentence in New Jersey Superior Court, Ocean County, for murder and related charges. (ECF No. 8.) Respondent filed an answer and brief in opposition to habeas relief. (ECF No. 10-12.) Petitioner was given an opportunity to file a reply brief, but he did not do so. (ECF No. 15.) For the reasons explained in this Opinion, the Court denies the petition and also denies a certificate of appealability.

### I.  <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

  When a person in custody pursuant to a state-court judgment challenges that judgment in a petition for writ of habeas corpus, factual determinations made by the state court are presumed correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The New

Jersey Superior Court, Appellate Division made the following findings of fact on Petitioner's direct appeal:[1]

### A. The Olivares Murder Proceeding

The following facts are derived from the trial record. In February 2006, Christian Vivar Granados was an eyewitness to a violent incident that led to criminal charges against Scott, Russell, and Tyleek Baker relating to the murder of Jose Francisco Olivares in a Lakewood barbershop. During his 9-1-1 call, Granados identified one of the participants by nickname and first name. He also gave statements to the police and identified all three participants in photographs.

Granados's name and address appeared in the police reports and other documents produced during discovery in the Olivares murder proceeding. At a plea cut-off hearing in August 2008, Scott and Russell acknowledged that they had reviewed the discovery materials with their attorneys. The court set the trial date for September 15, 2008.

Jury selection began on September 17, 2008. On October 7, 2008, the trial judge advised the defendants that opening statements and witness testimony would begin on October 14, 2008.

### B. The Plan to Silence Granados

According to Joseph Powell, on September 13, 2008, he was instructed by Shawn Craighead, a fellow gang member then incarcerated in the Ocean County Jail, to contact gang leader Cochran. When Powell met Cochran a few days later, Cochran told Powell that he was about "to take care of some bitch," which Powell understood to mean an unnamed witness. Cochran later confided that he had learned the witness's address – "in the Congress" - and if Powell spoke with Scott or Russell (who were incarcerated in the Ocean County Jail awaiting trial for the Olivares murder), Powell should tell them Cochran was "still working on that problem."

Soon enough, Powell spoke again with Cochran, telling him that Scott and Russell kept calling him. Cochran responded that "if [you] talk[] to [them], to let [them] know that the situation is taken

---

[1] The Appellate Division consolidated the direct appeals of Petitioner and his codefendants, Jamell D. Scott, James S. Russel, and Trishawn F. Cochran. All three individuals challenged "their convictions and sentences following a joint jury trial involving charges related to a plot to silence a witness to a prior murder." (ECF Nos. 11-27 at 16–78 and 11-28 at 4–59); *State v. Scott, Reeves, Russell, and Cochran*, Nos. A-2580-09T1, A-4100-09T1, A-4101-09T1, A-6279-09T3, slip op., at 3 (N.J. Super. Ct. App. Div. April 16, 2013). To avoid confusion, this Court will cite to the direct appeal opinion by the Appellate Division as *Reeves*, No. A-4100-09T1, slip op.

[sic] care of. That [Reeves] was going to take care of it in the Congress. But if [you] talk[] to him [sic], don't mention [Reeves] or the Congress."

On Friday, October 10, 2008, Russell called Powell. The following verbatim exchange, captured on an audio recording, occurred:

[Russell]: Big bro bust at you and told you tell "Brave" [Cochran] that shit?

[Powell]: About the pants, right?

[Russell]: Yeah.

[Powell]: Word.

[Russell]: Yeah, I know that like, that's like top priority, ya hear.

[Powell]: Word, I told 'em I'd let him have that by Sunday and shit.

[Russell]: Yeah, na, but ah, motherfucker ah, tell "Brave" ta ah, tell "Brave" "Big Bro" said, tell, tell "Brave" "Big Bro" said, "Handle that CVS thing[,]" ya heard?

[Powell]: CVS thing ya said?

[Russell]: Yeah.

[Powell]: A-ight[.]

[Russell]: He be knowin', he be knowin' what it is en shit.

[Powell]: Word.

[Russell]: Ya tell 'em niggers you know what I mean, throw, throw a barbeque and speak about that shit.

[Powell]: No doubt.

[Russell]: Yeah, Nig, niggers goin' have ta fight this war on Tuesday, ya heard?

[Powell]: Yeah, I'm gonna be up there Tuesday.

[Russell]: Yeah, I know that. Yeah, we just, we just wavy right now man. I mean I got this thing in neutral patiently waitin' (inaudible) know what I mean?

[Powell]: Word.

In another tape-recorded conversation on the afternoon of Monday, October 13, 2008, Scott told Powell: "Bust that 'Brave' that nigger you know what I mean ta handle that shit you know what

I mean, he knows what to do with that shit." Powell replied: "He's hittin' me back," and Scott answered: "A-ight, I'll be at ya later on tonight and shit." Powell testified that "Bust that 'Brave" meant to call Cochran, and the reference to "handle that shit" referred to "[t]he situation with the witness."

Approximately one hour later, Russell telephoned Powell. Russell asked if Powell knew whether Cochran had "handle[d] that shit." Powell replied that he had talked to everyone but Cochran. Russell responded: "Motherfucka you know niggers tryin', you know what I mean, take it, take it ta a different level, ya heard?" Powell explained that Russell was asking if he had taken care of the witness situation and telling him to "get the job done."

After Tuesday, October 14, 2008, Powell stopped taking telephone calls from any street gang member in the Ocean County Jail. He testified that he was "afraid of getting caught up between the murder with the phone calls."

### C. The Vazquez Murder

On Tuesday, October 14, 2008, Granados was staying with his girlfriend, Alisa Morales, and her mother, Thelma Vazquez, at the Congress Apartments in Lakewood. Prior to that day, a defense investigator had visited a different address listed for Granados in the Olivares discovery materials and was directed by Granados's mother to reach Granados at the Congress Apartments.

Shortly before 6:00 a.m., Vazquez was sleeping on the sofa in the living room when the household's dog began barking. Morales and Granados, who were in the bedroom, heard Vazquez call for the dog and ask, "Que lo que?" Then they heard gunshots. Upon entering the living room, they saw the front door open and Vazquez bleeding on the sofa. While Granados called 9-1-1, Morales ran outside in an effort to get a glimpse of the shooter, but she did not see anyone.

Within moments, Lakewood Police Officer Robert Anderson received a dispatch call to respond to a shooting at Vazquez's apartment. Upon entering the unit, he observed Vazquez with multiple bullet wounds. The front door was "pushed in" and "busted off" the jam, and wood was missing under the striker plate. Vazquez was taken by ambulance to nearby Kimball Medical Center, where she died.

### D. The Ocean County Jail Investigation

On the same day as Vazquez's murder, Sergeant Joseph Valenti of the Ocean County Department of Corrections coincidentally learned of a security threat involving contraband razor blades in the East E section of the Ocean County Jail. While

correction officers searched inmates and cells, Valenti accessed and listened to tape-recorded telephone calls made by inmates between October 8 and 14, 2008, "to see if [he] could see if somebody had something to do with the four razor blades that were going to be used to cut up possible officers."

Valenti testified that all telephone calls by inmates were routinely tape-recorded and monitored for security threats. Upon entering the jail, inmates completed a form listing five people they wished to call, plus one attorney. Inmates then received a personal identification number (PIN), which they had to enter into the telephone system before placing a telephone call. Each PIN was traceable to the inmate's housing assignment.

As he reviewed the records of telephone calls and their associated PINs, Valenti noticed that inmate Perfecto Salgado, housed in the jail's North C section, appeared to be making telephone calls from the East E section even though he was not housed there. When Valenti listened to the recordings of telephone calls made with Salgado's PIN, Valenti identified the voices of inmates Russell, Scott, and Craighead. Valenti verified the actual callers' identities by viewing video recordings taken from cameras inside the jail.

Valenti knew that Russell and Scott were on trial for a first-degree crime in the Olivares murder proceeding, and that someone very close to a key witness in that trial was shot and killed earlier that day. Valenti testified that Salgado and Scott were housed in the same jail section from November 22, 2007, through December 3, 2008, and that Scott and Craighead were cellmates from September 6, 2008, through November 6, 2008.

Valenti became alarmed after listening to one of Russell's telephone calls that occurred on October 9, 2008. In that conversation Russell told the other person that something had to be done by Tuesday before the trial: "it's gotta be done by Sunday, Monday the latest 'cause niggers go to court Tuesday, you dig." Valenti contacted Ocean County Prosecutor's Office Investigators Carlos Trujillo-Tovar and Casey Long to advise them of a possible connection between the jailhouse conversations and Vazquez's murder.

Long obtained a court order to review additional telephone conversations using Salgado's PIN from September 2 through October 17, 2008. There were ninety-five telephone calls involved, but Long believed only eight were relevant to the murder of Vazquez. The number was later pared for trial.

Salgado denied using the telephone at the jail, explaining that his family lived in Mexico. Moreover, he confirmed that he did

not fill out the PIN request form or sign it. He testified that Scott — known to Salgado as "Cinco" — had completed and signed the form. Scott also filled out the information on two "Telephone Delete Add Request" forms, which Salgado admittedly signed. Salgado was not familiar with any of the names or telephone numbers on those forms.

### E. The Shooter

Wenda Guzman testified that on the night before Vazquez's shooting, Reeves slept on the futon in the living room of Guzman's apartment. Shortly before 6:00 a.m. on October 14, 2008, Reeves asked Guzman "to take a walk with him so he [could] fulfill an order." During the walk, Guzman noticed the handle of a gun at Reeves's waist. When she asked him about the gun and the order he was going to fulfill, Reeves would not give her a straight answer. Guzman decided to go home and left Reeves when he turned onto Congress Street.

Reeves returned to Guzman's apartment a few minutes later. Guzman testified that he looked "just fine." He took a shower, asked for a change of clothes, went to sleep on the futon, and left the apartment in the early afternoon.

That same day, James Wallace received a telephone call from Reeves, asking to meet him. Reeves had previously told Wallace "he had to put some work in at the Congress" with "some Spanish cat." When they first met after the shooting, Reeves told Wallace that he had gone to the witness's apartment, kicked in the door, and started shooting until the gun jammed.

Around this time, Reeves gave Wallace a nine-millimeter Smith and Wesson handgun. Wallace wrapped the handgun in a t-shirt, and hid it in his backyard until Reeves asked for it.

Reeves's live-in girlfriend, Shaunita Foskey, learned of the Vazquez homicide on October 14, 2008, which happened to be her birthday. The next day, Reeves told Foskey that he wanted to tell her something "[a]bout the Congress" and "[t]hat lady." Foskey replied, "I don't want to hear nothing."

Around October 17, 2008, Reeves spoke again with Guzman. According to her account, "[h]e pulled me to the side, let me know that the whole order has been fulfilled, and then he proceeded to explain of what his action[s] were of that night." Specifically, Reeves said that "he kicked down the door, let off shots, the gun jammed and he took off running."

Also around this time, Reeves asked Wallace to return the handgun. The weapon, still wrapped in a t-shirt, ended up with Reeves at Foskey's dwelling. She testified that Reeves cleaned the handgun and removed "the dirt from the hole [meaning the barrel]

of the gun" with an old toothbrush. As Reeves was cleaning, she saw a copper-looking shell casing inside the handgun. Reeves removed the casing, wrapped it in a tissue, and stated, "without the casing, they don't have anything."

Foskey then listened as Reeves told her "the whole story." He explained that "his Big Homey said the witness had to go," meaning he was ordered to kill a witness, and "he had to do what [he] had to do." Reeves admitted to Foskey that he kicked Vazquez's door open, shot whoever was on the couch, and ran off when the gun jammed. Only later did Reeves realize that he shot the wrong person, saying he meant to shoot the "lady's son-in-law," who was "supposed to have been the witness." Sometime after that, he and Foskey went to Camden, where Reeves dropped the shell casing into a street drain.

During the early morning hours of October 22, 2008, Reeves, Wallace, and Stephanie Tansley decided to drive to a liquor store. On the way, Reeves told Tansley — in confidence — that "he went to this house, kicked down the door, had a gun in his shirt and shot," and that he ran when the gun jammed. He asked her if she wanted to go there, and Tansley said yes. Tansley then drove Reeves and Wallace to the Congress Apartments.

Wallace testified that Reeves wanted to show Tansley where he had killed "that bitch at." Leaving Wallace in the car, Reeves and Tansley walked up the stairs to Vazquez's apartment, at which time Tansley saw a police officer in a marked police vehicle below them. They "ran down the stairs and went back into the car," and Tansley drove them to a bar and liquor store before heading to another friend's house.

Lakewood Police Officer Kevin Doyle testified that he was on patrol that morning in the area of the Congress Apartments. At about 1:45 a.m., he noticed a vehicle — "the only vehicle on the street at this time" — moving at a high rate of speed. He followed at a distance and watched it enter the Congress Apartments complex. He found the vehicle parked in front of Vazquez's apartment, and observed a black male and white female standing directly in front of the apartment unit's door. After he drove by, he saw the two individuals immediately return to their vehicle and drive away.

After losing sight of the car, Doyle noticed it approximately thirty minutes later. He followed, and eventually pulled it over. He identified Tansley as the driver, Reeves as the front-seat passenger, and Wallace as the rear-seat passenger. He asked each of them why they went to the apartment and whether they knew about the murder. Reeves told Doyle that he was visiting a friend who lived there,

giving the police officer a "bogus name." The officer allowed Reeves and the others to leave.

The same day, Reinaldo Feliciano was stopped by a state trooper in Lakewood for a motor vehicle violation and was taken to the Lakewood police headquarters. There, he was interviewed by investigators from the Ocean County Prosecutor's Office because he indicated that he had information about the Vazquez shooting. He explained that the weekend before the shooting, Reeves said he needed a ride "to go take care of the bitch . . . [b]efore they [sic] get on the stand to testify . . . against one of his homies." According to Feliciano, Reeves said that if he did not get the job done, he would be disciplined — beaten while surrounded — by his fellow street gang members. Feliciano also stated that Reeves called him the day after the shooting and told him the job was done and "he needed a ride out of town . . . because it was too hot for him to be around." The following day, Reeves told Feliciano in person that "he killed the bitch, and that his gun jammed and he bounced."

In December 2008, Foskey provided information about the location of the shell casing in Camden, which the police recovered from beneath the sewer grate in short order. Several months later, further investigation resulted in the recovery of a nine-millimeter Smith and Wesson handgun, which was forensically linked to the shell casing recovered in Camden and a shell casing found at the scene of Vazquez's shooting.

### F. Reeves's Testimony

Reeves testified at trial. He freely admitted that he murdered Vazquez. Cochran, Scott, and Russell did not testify or call any witnesses.

Reeves told the jury that Powell recruited him into the Bloods by "jumping me in," meaning he suffered a beating and bled. At the beginning of October 2008, Reeves said that Powell ordered him to kill a witness, and threatened to "DP" him if he refused. Reeves explained that "DP" meant "dependent upon how serious the infraction is that you do, basically me not killing somebody would mean that I would get killed." When Feliciano tried to talk him out of committing the crime, Reeves told him that the shooting had to be done or it would "come back on me."

Reeves testified he did not mean to kill Vazquez, calling it "an accident," but said he had to do it. He thought the victim was Granados because it was dark inside the apartment. Reeves knew that what he did was wrong and that he deserved to spend time in prison.

8

Although Reeves admitted telling Guzman and Wallace that Scott was his Big Homey, at trial he maintained that his Big Homey was Powell. Reeves conceded that he told Wallace that he "received orders from [his] [B]ig [H]om[ey] to take care of a witness for [the] [B]ig [H]om[ey]'s trial." He also admitted telling Feliciano, Clark, and Guzman that his Big Homey was in jail, which Powell was not.

Reeves confirmed that he tried to take Feliciano with him when he did the shooting. He admitted telling Feliciano that he "had to take care of some bitch before the bitch got on the stand to testify against one of [his] homies." He explained that "the bitch" referred to Granados, because he was "a snitch." Likewise, he admitted telling Wallace that he had "to put in work on some Spanish cat in the Congress."

### G. Rebuttal Testimony

The State presented Guzman, Foskey, and Wallace as rebuttal witnesses. Guzman said Reeves told her in August 2008 that Scott was his Big Homey. He also told her that the order to kill the witness originated with Scott and that it was handed to him down the street gang's chain of command. Reeves never told her that he had been threatened with discipline. Foskey and Wallace similarly testified that Reeves told them Scott was his Big Homey. According to Foskey, Reeves said that Scott sent word that the witness "had to go."

*Reeves*, A-4100-09T1, slip op. at 4–18.

On October 28, 2009, Petitioner Reeves was found guilty of all charges. (ECF No. 11-10 at 5–6.) On December 1, 2009, Petitioner was sentenced to the following concurrent terms of imprisonment, after merging certain counts: (1) life, subject to the No Early Release Act ("NERA"), for the murder of Thelma Vazquez; (2) 20-years, subject to NERA, for the attempted murder of Christian Vivar Granados; (3) 20-years, subject to NERA, for the attempted murder of Alisa Morales; (4) 10-years, subject to NERA, for burglary; and (5) 20-years flat for witness tampering. (ECF No. 11-11 at 7–8.)

Petitioner filed a direct appeal. On April 16, 2013, the Appellate Division affirmed the judgment of conviction. *Reeves*, No. A-4100-09T1, slip op. (ECF No. 11-27 at 16–78; ECF No.

11-28 at 4–59.) The New Jersey Supreme Court denied Petitioner's petition for certification. *State v. Russell*, 76 A.3d 544 (N.J. 2013).

Petitioner also filed for post-conviction relief ("PCR"). On April 29, 2016, following a hearing, the PCR court denied his petition. (ECF No. 11-31 at 4–73.) Petitioner appealed, and the Appellate Division affirmed the PCR court's decision. *State v. Scott*, A-4765-15T21, A-0422-16T2, A-0531-16T2, 2019 WL 3811913 (N.J. Super Ct. App. Div. Aug. 14, 2019). The New Jersey Supreme Court denied Petitioner's petition for certification. (ECF No. 11-33.) Petitioner timely filed his habeas petition on June 18. 2020. (ECF No. 1.)

## II.    LEGAL STANDARD

An application for writ of habeas corpus by a person challenging a state court judgment court may only be granted based on violations of the Constitution or laws or treaties of the United States. *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254); *Nayee v. Adm'r New Jersey State Prison*, No. 21-2022, 2023 WL 4785514, at *1 n.3 (3d Cir. July 27, 2023) (finding New Jersey state caselaw is inapplicable on habeas review). Under 28 U.S.C. § 2254(d), federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under §

2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *accord Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011). Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct). In determining whether a state court decision was based on an unreasonable determination of the facts:

> federal court review considers only whether the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The statute directs the federal court to presume that all determinations of fact made by the state court are correct and requires that the petitioner present "clear and convincing evidence" to rebut this presumption.

*Hunterson v. DiSabato*, 308 F.3d 236, 245–46 (3d Cir. 2002) (citing 28 U.S.C. § 2254(e)(1); *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 368 (3d Cir. 2002)). This is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The proper state court decision for federal habeas corpus review is the "last reasoned" state court decision. *Wilson v. Sellers*, 584 U.S. 122, 125, 129 (2018); *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson*, 584 U.S. at 125; *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen*, 563 U.S. at 187.

## III.    DISCUSSION

### A.  Prosecutorial Misconduct (Ground One)

In Petitioner's first ground for relief, he alleges that statements made by the prosecutor during summation rendered his trial unfair. (ECF No. 1 at 5.) He contends that the prosecutor disparaged his duress defense and made arguments that were not supported by the facts. (*Id.*)

The Appellate Division denied this portion of Petitioner's claim as follows:

> Scott and Reeves contend the prosecutor made improper comments about Reeves's defense of duress. They challenge the prosecutor's characterization of Reeves's testimony as "a last ditch effort, a tale, a Hail Mary Pass," and his explanation that Reeves "didn't know what his defense was until he got up there." Reeves also challenges the following comments as mocking his defense:
>
> > [Reeves] had choices. Now he wants to use the gang as a defense. I had no choice, I was going to be killed. Don't hold me fully accountable for what I did. I was under duress. Isn't that a great state of affairs, great thing for gangs now. Oh, you wanted to do something, you're going to die so I got to do a robbery because that's what duress does, it negates guilt. The only thing it doesn't totally negate it for is murder, you can knock it down to manslaughter or aggravated manslaughter, but the court thing, the witness tampering, if you believe it's duress, he's not guilty. Isn't that great?

12

He further objects to the prosecutor's remarks that the jury should not allow him "to use the gang as a defense," and the prosecutor's description of duress as "a defense to clear gang members from going in and killing and murdering innocent people."

Scott also challenges the prosecutor's statement that "I bit my lip so hard I almost bled." He claims the prosecutor was improperly expressing a personal reaction to Reeves's testimony.

We discern no merit in the contentions by Scott and Reeves that the challenged comments were so egregious that they deprived both defendants of a fair trial. Regarding the reference to duress in the context of street gangs, the court gave a limiting instruction and it is presumed the jury followed it. Moreover, these comments, even if improper, were only a small portion of the prosecutor's lengthy summation and, when taken in context, did not unfairly prejudice defendants.

. . . .

[T]he isolated comments about Reeves's last-minute defense were made in response to his attorney's summation, and were not intended to disparage the defense of duress.

While the prosecutor's comments regarding duress do not warrant a new trial, his comment about biting his lip in reaction to Reeves's opening argument is more troublesome. "'A prosecutor is not permitted to cast unjustified aspersions' on defense counsel or the defense." A prosecutor, therefore, may not subject defense counsel to disparaging remarks for simply doing his or her job. Nevertheless, although this comment was an improper expression of the prosecutor's personal opinion as to Reeves's guilt, it was not only isolated and insufficiently prejudicial by itself to warrant reversal, but the trial court instructed the jurors that statements by counsel were not evidence.

Reeves contends the prosecutor's improper comments during summation cumulatively deprived him of the right to a fair trial. We are unpersuaded.

… [T]he inquiry on review is whether the cumulative impact of the errors prejudiced the fairness of the defendant's trial. A defendant, however, is entitled to a fair trial, not one that is error free.

We are satisfied that defendants would have been convicted even had they received a perfect trial.

*Reeves*, No. A-4100-09T1, slip op. at 75–79 (quoting *State v. Frost*, 158 N.J. 76, 86 (1999)).

Here, the Appellate Division did not unreasonably apply clearly established federal law or unreasonably determine the facts in light of the evidence. A habeas claim based on prosecutorial misconduct should be granted only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). "If the argument was improper, we determine whether it justifies relief by 'examin[ing] the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant.'" *United States v. Savage*, 970 F.3d 217, 291 (3d Cir. 2020) (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)) (alteration in original).

Petitioner cannot meet the high standard for relief on his prosecutorial misconduct claim. Viewed in context, the prosecutor's comments about the duress defense were an appropriate comment on the evidence in the record. Witnesses testified that Petitioner wanted to attain a higher "stain" or rank within the gang by killing Granados. (ECF No. 10-20, 20T11:15–21, ECF No. 11-4, 24T108:1–8.) This was consistent with testimony that, before the murder, Petitioner told others he intended to kill the witness, and after the murder he told others he committed the murder, but he never told them he was being forced to do so under threat of death. (ECF No. 11-4, 24T23:16–20, 26:2–20.) Therefore, the prosecutor was permitted to challenge the duress defense in his closing argument. *See Rolan v. Coleman*, 680 F.3d 311, 324 (3d Cir. 2012) (holding prosecutor's

comments about defendant's failure to previously assert self-defense were "a permissible attack on [defendant's] credibility.")

As for the comment about the prosecutor biting his lip, the Appellate Division concluded the remark was improper but did not violate Petitioner's rights. It appropriately applied federal law in making this determination because it found the remark was singular and fleeting, the trial court issued instructions that attorney's arguments were not evidence, and the evidence against Petitioner as a whole supported the verdict. *Savage*, 970 F.3d at 291; *see Rolan*, 680 F.3d at 323–24 (holding that in light of other evidence and curative jury instructions, prosecutor's potentially prejudicial comment did not deprive the petitioner of due process); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge." (internal quotation marks omitted)); ECF No. 11-6, 26T24:18 to 25:18 (jury instruction on attorneys' arguments), 26:12–21 (jury instructions on limiting instructions). The Appellate Division reasonably applied federal law and the decision is not objectively unreasonable. Therefore, the Court denies relief on Ground One of the petition.

### B.  Jury Instructions on Duress (Ground Two)

Petitioner argues in Ground Two that "[t]he instruction on the affirmative defense of duress was not consistent in explaining that the state bore the burden of proving the absence of duress beyond a reasonable doubt before defendant could be found guilty of any of the charges." (ECF No. 1 at 9.) He asserts "the instruction mangled the state's burden of proof" and the instructions "were entirely abstract, and failed to integrate the defense with the charges under consideration." (*Id.*)

The Appellate Division rejected these arguments on direct appeal:

Consistent with the model jury charge, the trial court instructed the jury on the defense of duress. At the conclusion of the final charge, Reeves's counsel asked the court to instruct the jury that the duress defense applied to all charges. The court denied the request.

For the first time on appeal, Reeves objects to the following portion of the model charge:

Before conduct, which would otherwise be criminal, can be excused on the ground that such conduct was the direct result of force or threats of force upon the defendant or another, the evidence must indicate that the following conditions existed at the time:

1. There was use of, or threatened use of, unlawful force against the person of the defendant or another; and

2. The force, or threatened force, would be of such a type that a person of reasonable firmness in a similar situation would have been unable to resist.

Reeves claims that the highlighted language "confuses the judge's responsibility to decide if there is sufficient evidence to warrant a charge on duress with the state's burden to disprove the defense."

*Reeves*, No. A-4100-09T1, slip op. at 100–01 (emphasis in original) (quoting Model Jury Charge (Criminal), "Duress" (1982)). The Appellate Division concluded that "[t]he challenged four words merely informed the jury of the requirement that there must be some evidence that the elements of duress existed" and was "a proper statement explaining that in order to raise the defense, a defendant must present facts that could warrant consideration of the defense of duress." *Id.* at 103. "As Reeves acknowledges, later in the jury charge the trial court correctly instructed the jury that the State shouldered the burden of proof. As such, the overall instruction on the duress defense was neither contradictory nor inconsistent." *Id.*

As to the second argument, the Appellate Division noted that

The trial court instructed the jury that "[i]n defense of the charges against him, defendant Lee C. Reeves contends he is not guilty because at the time of the offenses, he acted under duress." It explained: "In other words, he was coerced to commit offenses due

16

to the use of, or a threat to use, unlawful force against him or another person." It also stated:

> The State has the burden to prove beyond a reasonable doubt each element of the charged offenses. The State also has the burden to disprove, beyond a reasonable doubt, the defense of duress.
>
> If you find that the State has proven beyond a reasonable doubt each element of the offense you are considering, and that the State has disproved beyond a reasonable doubt the defense of duress, you must find the defendant, Lee C. Reeve[s], guilty of the offense.
>
> If you find the State has not proved beyond a reasonable doubt each element of the offense you are considering, or that the State has not disproved beyond a reasonable doubt the defense of duress, you must find the defendant, Lee C. Reeves, not guilty of that offense.
>
> Thus, viewing the jury charge as a whole, the court's multiple references to offenses and charges led the jury to understand that the defense applied to all counts of the indictment, not just murder.

*Reeves*, No. A-4100-09T1, slip op. at 103–04 (emphasis in original).

"To show that a jury instruction violates due process, a habeas petitioner must demonstrate both (1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Williams v. Beard*, 637 F.3d 195, 223 (3d Cir. 2011) (internal quotation marks omitted). "In making this determination, the jury instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (internal quotation marks omitted). "Because it is not enough that there is some slight *possibility* that the jury misapplied the instruction, the pertinent question is whether

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process." *Id.* (emphasis in original) (internal quotation marks omitted).

The Appellate Division reasonably concluded that the trial court's instruction to the jury

was not ambiguous. The instruction followed the model jury charge for duress and made clear to

the jury that the State had the burden of disproving duress for each charged offense. The Appellate

Division considered the instructions as a whole as required by federal law, and its decision is not

objectively unreasonable. Therefore, the Court denies relief on Ground Two of the petition.

### C. Denial of Change of Venue (Ground Three)

In his third ground for habeas relief, Petitioner argues that the trial court erred in denying

Petitioner's motion for change of venue based on pretrial publicity in a related matter. (ECF No.

1 at 11–15.) Petitioner contends that the pretrial publicity from the related "barbershop murder"[2]

was too prejudicial and required a change of venue. Petitioner raised this claim on direct appeal.

The Appellate division denied the claim as meritless, stating the following:

> To assure impartiality in criminal trials, courts must excuse
> potential jurors who have formed an opinion as to the defendant's
> guilt or innocence. *State v. Williams*, 93 N.J. 39, 61, 459 A.2d 641
> (1983). "Only if it is demonstrated that 'the juror can lay aside his
> [or her] impression or opinion and render a verdict based upon the
> evidence presented in court' will extraneous exposure to the facts of
> the case not be grounds for automatic disqualification." *Ibid.*
> (quoting *State v. Sugar*, 84 N.J. 1, 23, 417 A.2d 474 (1980)).
>
> . . . .
>
> Courts distinguish between "'cases in which the trial
> atmosphere is so corrupted by publicity that prejudice may be
> presumed, and cases in which pretrial publicity, while extensive, is
> less intrusive, making the determinative issue the actual effect of the
> publicity on the impartiality of the jury panel.'" [*State v. Nelson*, 173
> N.J. 417, 475, 803 A.2d 1 (2002)] (quoting *State v. Biegenwald*, 106
> N.J. 13, 33, 524 A.2d 130 (1987)).

---

[2] Petitioner's reference to the "barbershop murder" refers to the Olivares murder. The Court will refer to
that murder trial as the Olivares murder trial.

Cases involving presumed prejudice "are relatively rare and arise out of the most extreme circumstances." *State v. Koedatich*, 112 N.J. 225, 269, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989). They involve situations where the community has been saturated with inflammatory and prejudicial pretrial publicity, and there has been an insufficient effort to "root out" jurors exposed to it. [*State v. Harris*, 156 N.J. 122, 153, 716 A.2d 458 (1998), cert. denied, 532 U.S. 1057, 121 S. Ct. 2204, 149 L. Ed. 2d 1034 (2001).] Such publicity may include editorial opinions on a defendant's guilt or innocence, or media pronouncements on a defendant's "deathworthiness." *Id. at 144-48*. Thus, there must be a deluge of media activity that creates "a carnival-like setting in which 'the trial atmosphere is so corrupted by publicity that prejudice may be presumed.'" *Id. at 143* (quoting *Biegenwald*, *supra*, 106 N.J. at 33). To determine whether presumed prejudice exists, a court is obliged to consider such factors as:

> (1) evidence of extreme community hostility against defendant;
>
> (2) prominence of either the victim or defendant within the community;
>
> (3) the nature and extent of news coverage;
>
> (4) the size of the community;
>
> (5) the nature and gravity of the offense; and
>
> (6) the temporal proximity of the news coverage to the trial.
>
> [*Nelson*, *supra*, 173 N.J. at 476.]

Where prejudice is not presumed, "a court must evaluate whether under the totality of circumstances 'the jury process resulted in a fair and impartial jury' to determine if a change of venue is necessary to overcome the realistic likelihood of prejudice." *Ibid.* (quoting *Koedatich*, *supra*, 112 N.J. at 274). To determine actual bias as a result of pretrial publicity, the court relies on a voir dire examination of the jurors. *Koedatich*, *supra*, 112 N.J. at 274. An appellate court gives special deference to a trial court's determination regarding jury bias, and ordinarily will affirm absent an abuse of discretion. *Nelson*, *supra*, 173 N.J. at 476-77.

This case is not one of these rare situations where prejudice may be presumed due to a circus-like, inflammatory atmosphere. The nature and extent of the news coverage did not demonstrate presumed prejudice. News reports that simply recite the charges against the accused and present an outline of facts alleged in the indictment are not unduly prejudicial. *Harris*, *supra*, 156 N.J. at 142. Criminal defendants are not entitled to jurors who are totally ignorant of the facts and issues in their case. *State v. Harvey*, 151

N.J. 117, 211, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000).

There was no evidence of extreme community hostility, given the jurors' vague recollections of the underlying facts in the Olivares matter. Neither defendants nor Vazquez were prominent members of the community. Thus, despite the gravity of the charges, the majority of factors in *Nelson* weigh in favor of the State's position.

Likewise, there was no actual prejudice. The trial court specifically questioned each juror about knowledge of another multi-defendant trial in Ocean County within the last two years where defendants faced the prospect of life imprisonment. For jurors who answered in the affirmative, the court made further inquiries into their knowledge of the previous case, their source of information, and their ability to remain fair and impartial. The court excused any potential juror who revealed prejudicial exposure or indicated an inability to remain impartial. It also repeatedly informed jurors of their duty to avoid any news articles or broadcasts. Jurors are presumed to follow the court's instructions. *State v. Loftin*, 146 N.J. 295, 390, 680 A.2d 677 (1996).

Defendants argue that the responses of approximately one-quarter of the total juror pool revealed some knowledge of the connection between the Vazquez and Olivares murders from outside sources. From this unadorned statistic, they contend that the entire venire was poisoned by extensive evidence of prejudicial pretrial publicity on the related murders and street gang violence. They further argue that prospective jurors knew defendants Scott and Russell had been found guilty of murder in the Olivares trial.

Contrary to defendants' assertions, the record does not support these contentions. The jury pool was sufficiently large to allow the court to find twelve impartial jurors and four alternates. We disagree that there was actual prejudice, or that prospective jurors knew Russell and Scott had been convicted in the prior case. The denial of the motion to change venue was correct.

*Reeves*, No. A-4100-09T1, slip op. at 25–30.

A criminal defendant's right to be protected from prejudicial trial publicity arises from the state and federal constitutional right to a fair and impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). However, jurors are not required to be totally unaware of the facts and issues involved in a case. *Murphy v. Florida*, 421 U.S. 794, 799–800 (1975). "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."

*Id.* (quoting *Irvin*, 366 U.S. at 723). A defendant can establish actual prejudice by presenting evidence to show that "those who actually served on his [or her] jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992), *overruled on other grounds*, *Brecht*, 507 U.S. 619.

However, "where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Id.* at 1252. "The community and media reaction, however, must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury. . . . Such cases are exceedingly rare." *Id.* at 1252–53.

To determine whether trial publicity has prejudiced the jury, courts must: (1) determine whether the news coverage is prejudicial; (2) if so, determine whether any jurors were exposed to the coverage; and (3) if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality. *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 163 (3d Cir. 1997).

Petitioner fails to demonstrate that the Appellate Division's determination was contrary to or an unreasonable application of clearly established federal law as set forth by Supreme Court precedent, as required by 28 U.S.C. § 2254(d)(1). First, the Appellate Division addressed the issue of presumed prejudice, finding that "this case is not one of these rare situations where prejudice is presumed due to a circus-like inflammatory atmosphere." *Reeves*, No. A-4100-09T1, slip op. at 28. Although Petitioner alleges there were fifty-four articles from the Asbury Park Press and other

newspapers regarding the two murders, the Appellate Division explained there was no evidence of extreme community hostility and that the jurors only had a vague recollection of the underlying facts of the Olivares murder trial. *Id.* at 29. It was also noted that the defendants were not prominent members of the community. *Id.* The court explained that news reports that recite the charges and present an outline of the facts of the case are not "unduly prejudicial." *Id.* at 28.

Second, the Appellate Division addressed the issue of actual prejudice. The trial court questioned every juror who indicated they had knowledge of the Olivares murder trial. *Id.* at 29. The court questioned the jurors on their specific knowledge of the previous trial, their source of information, and their ability to remain impartial. *Id.* The Appellate Division explained that the trial court excused any potential juror who revealed an inability to be impartial or who revealed prejudicial exposure. *Id.* While Petitioner cites to the comments from multiple potential jurors regarding their recollection of the Olivares murder, the Appellate Division found that with fifty-one out of two hundred potential jurors indicating that they were familiar with the Olivares murder and its connection to Petitioner, the jury pool was "sufficiently large to allow the court to find twelve impartial jurors and four alternates." *Id.* at 30. The Appellate Division addressed both presumed and actual prejudice and found this claim meritless.

For these reasons, the state court's rejection of this claim does not violate clearly established federal law; nor was it an unreasonable application of Supreme Court precedent. Therefore, the Court denies relief on Ground Three of the petition.

### D.  The *Batson* claim (Ground Four)

In his fourth ground for relief, Petitioner argues the preemptory strike of the only African-American member of the jury panel by the prosecutor violated Petitioner's state and federal constitutional rights to an impartial jury. (ECF No. 1 at 16–19.)

*Batson v. Kentucky* set forth a three-step inquiry to determine the constitutionality of a peremptory strike. 476 U.S. 79 (1986). First, "the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice*, 546 U.S. at 338. If this showing is made, then "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id.* "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* The court must evaluate "the persuasiveness of the justification" offered by the prosecutor, but "the ultimate burden of persuasiveness regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* The Supreme Court explained the trial court's role at step three of the *Batson* inquiry:

> The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, *see* 476 U.S., at 98, n. 21 [], and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," *Hernandez*, 500 U.S., at 365, 111 S. Ct. 1859 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often involve a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" *ibid.* (*quoting Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]," 500 U.S. at 366, 111 S. Ct. 1859 (plurality opinion).

*Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

The Appellate Division thoroughly considered this claim on direct appeal and denied it as meritless. The Appellate Division summarized the juror's initial responses on voir dire as follows:

The juror told the court that she could consider the evidence and the law with an open mind. She added:

> [F]irst of all, you have to understand what the evidence is presented and if the evidence is not, you know, strong enough to prove the case, then how could you say the person is guilty or not guilty. First you have to understand both sides because there are three sides to every story. There is the truth of their story and then there is the truth of someone else's story and the truth lies in the middle.

The juror believed that she could serve well, explaining:

> This is my first time I've ever been called as a juror, but I understand that you are supposed to be tried by your peers and your peers are supposed to look like you so just looking at the jurors, I am the only one that looks like the people who are being tried so I feel that there needs to be a balance.

When asked what she considered the most important constitutional protection, she replied that "speaking as a black woman, everyone is entitled to their rights and that means a fair trial." She continued:

> That means to be treated as human beings regardless of your color and I feel that this is the most important here in America because black people have struggled for so many years without having their rights and I feel that it's most important we should keep that right.

The juror, who was a teacher in the Newark school system, did not believe that every individual in a street gang was involved in criminal activity, explaining that she had students in her class who were involved with street gangs and nonetheless went on to graduate. When asked if she would have any difficulty returning a guilty verdict, she answered with a question, "[b]eyond a reasonable doubt, and the State proved it"? She then responded, "I wouldn't have a problem convicting as long as I heard both sides."

*Reeves*, No. A-4100-09T1, slip op. at 41–42.

The following day, before continuing voir dire, the state informed the court that it would seek to exercise a peremptory challenge to excuse the juror. *Id.* Defense counsel objected and moved to preclude the juror's removal. Defense counsel noted that of the two hundred potential jurors, only two African American jurors had been called to the jury box, and the court dismissed

the other for cause. *Id.* at 43. The Appellate Division summarized the prosecutor's response as follows:

> The prosecutor argued that he did not use a peremptory challenge to remove the other prospective African American juror, and that he wanted to excuse the second such juror because of her views and opinions, not her race. Specifically, he objected to her comment that there were "three sides to every story," which he thought suggested an unwillingness "to accept the evidence of one side or another." When asked, "if the State were to prove the charges beyond a reasonable doubt, would [she] have any difficulty returning a guilty verdict," the prosecutor noted, "she hesitated, perceptibly for three, four or five seconds," and then answered with a question. Based on his experience, the prosecutor believed that if she had to think about the question, she should not be on the jury.

He then added:

> And then she says, after I asked her if she heard your Honor explain what [was] the definition of reasonable doubt, she says, I wouldn't have a problem convicting as long as I heard both sides. Well, Judge, there may very well be only one side in this case, which again that leads me to believe that possibly she's going [to] think these defendants are not getting a fair trial, that they were prevented from telling their side if they exercise their right not to testify which is perfectly their right. But I have some serious reservations about whether this lady would be willing to evaluate evidence, take it really for what it's worth, talk to the other jurors, and come to a verdict based on what she hears in the courtroom.
>
> I only need a slight bias to exercise a peremptory challenge, Judge, and I have a feeling that that's here in this case. The only answer she should have given to that question about [whether she would have] any difficulty on a verdict is no and that's not the answer we got and that's not acceptable to the State.

*Id.* at 43–45. The trial court found no *Batson* violation, explained that defendants failed to make a prima facie showing that the state's challenge was exercised on the basis of race. *Id.* at 45. After considering the state's practice of exercising its peremptory challenges, the trial court found that the defendants did not establish a pattern of group bias. *Id.* The Appellate Division explained that

the four other potential jurors of African-American descent had been dismissed for good cause,

including: "one male and one female, who had financial hardships; another male, who had a family

member with a pending criminal matter in Ocean County; and another female, who had requested

to be excused from the case because she lived near one of the defendants and felt uncomfortable."

*Id.*

The Appellate Division affirmed the trial court's finding that defendants failed to make a

prima facie showing that the state's challenge was exercised on the basis of race. *Id.* at 47–48. The

Appellate Division found:

> Even if the low-threshold, prima facie evidence of discrimination existed, however, there was a wealth of evidence proving that the contested peremptory challenge was going to be exercised on constitutionally permissible grounds. The court had previously excused, without objections, four prospective persons of color for cause. The State provided a non-pretextual and reasoned basis for the challenge. The record is bereft of evidence that the State was in engaged in a clear pattern of group bias by the prosecutor.
>
> Although the challenge removed the only African-American juror as of that point, this fact alone was insufficient to demonstrate the existence of an inference of discrimination. *See State v. Bey*, 129 N.J. 557, 584-85, 610 A.2d 814 (1992) (no prima facie showing where prosecutor exercised one peremptory challenge against the only remaining African-American juror and four against non-African-American jurors, and where six African-American jurors had been excused for cause, including one on the motion of defense counsel), supplemented by 137 N.J. 334, 645 A.2d 685 (1994), cert. denied, 513 U.S. 1164, 115 S. Ct. 1131, 130 L. Ed. 2d 1093 (1995); *State v. Lewis*, 389 N.J. Super. 409, 420-22, 913 A.2d 157 (App. Div.) (no prima facie showing where prosecutor used peremptory challenges to exclude three African-American jurors, and two African-American jurors remained), certif. denied, 190 N.J. 393, 921 A.2d 447 (2007).

*Id.* at 47–48.

The Appellate Division reasonably applied clearly established federal law, explaining how,

even if prima facie evidence of discriminatory intent existed, the prosecutor offered a race-neutral

explanation for striking the juror in question. *Rice*, 546 U.S. at 338. The record regarding the juror's answers during voir dire supports the prosecutor's nonracial reasons. Petitioner has failed to prove the state court's decision to deny Petitioner's *Batson* claim was contrary to, or an unreasonable application of *Batson* or that it based its decision on an unreasonable determination of the facts. Therefore, habeas relief will be denied on Ground Four of the petition.

### E.  Juror Impartiality (Ground Five)

In Ground Five of his petition, Petitioner argues his constitutional right to a fair trial by an impartial jury was violated when a juror conducted internet research on gang terminology. (ECF No. 1 at 20–21.) During deliberations, one juror informed the trial judge that Juror 12 had researched the meaning of phrases uttered during trial such as "Jim Jones" and "capo status," and had looked at song lyrics. (*Id.* at 21.)

On direct appeal, the Appellate Division found this claim meritless, stating the following:

> The juror who conducted the research was Juror 12. She freely admitted that she researched the phrases "Jim Jones" and "capo status," which had been uttered during the trial,[6] and looked at song lyrics, but denied listening to any songs. She told the jurors that based on the lyrics, it appeared that Jim Jones was "into drugs, looking good and nice cars. In other words, having nice things." She implied that "Jim Jones rock star status" meant that you wanted to look good. She said the information from the internet did not add to or contradict the evidence at trial. Juror 12 stated that she could disregard what she just learned, that she could reach a decision based solely on the evidence, and that she could be fair and impartial. She agreed to refrain from conducting any more research during the trial.
>
> > [Footnote 6] During Powell's testimony, he explained a reference made by Russel in one of the intercepted telephone calls from Ocean County Jail. At one point in the conversation, Russel said, "Niggers try ya know what I mean Rock Star Jim Jones status." Powell explained that Jim Jones, a Bloods member, was a rapper with "capo status," which was a high-ranking position in the street gang.
>
> The court then individually interviewed the remaining jurors, excluding the four alternates. When asked if they heard

anyone mention internet research, six jurors confirmed hearing something about music or a rap song about "Jim Jones rock star status" or what it meant. One juror also heard something about "Master Ru." Four jurors did not hear any discussions about internet research.

All of the jurors told the court that they could disregard the information obtained from the internet, that they could reach a decision based solely on the evidence, and that nothing occurred that would prevent them from being fair and impartial. The court instructed them not to discuss the matter further.

. . . .

Because defendants did not object at trial, we will not reverse unless we find plain error, namely, error "clearly capable of producing an unjust result." R. 2:10-2. Not any possibility of an unjust result will suffice; the possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." [*State v. Macon*, 57 N.J. 325, 336, 273 A.2d 1 (1971).] Applying this standard, we conclude that, considering the swift and entirely appropriate involvement by the trial court, any error was harmless and does not warrant reversal. *See, e.g., State v. Sowell*, 213 N.J. 89, 97, 61 A.3d 882, 887 (2013).

The trial court implicitly found that the jurors exposed to the outside information were credible, and its determination is entitled to deference given the court's opportunity to observe their demeanor. [*State v. R.D.*, 169 N.J. 551, 559, 781 A.2d 37 (2001).] The court also gave defense counsel an opportunity to raise an objection after questioning of the jurors, but no one did. The jury resumed deliberations and reached a verdict without any further incident.

*Reeves*, No. A-4100-09T1, slip op. at 84–87.

Petitioner fails to demonstrate that the Appellate Division's determination was contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to a trial by an impartial jury. *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976). Trial judges, therefore, must be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Nevertheless, "it is virtually impossible to shield jurors from every contact or influence that might theoretically

affect their vote," and the Sixth Amendment and due process "do[ ] not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* To that end, district courts have "wide discretion . . . [in] areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). Additionally, jurors are presumed to be impartial, and it "is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. Thus, removal is required only upon the showing of "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Id.* (quoting *Reynolds v. United States*, 98 U.S. 145, 157 (1878)).

Here, the trial court's actions questioning each noted each juror regarding their knowledge of Juror 12's research and any potential bias was reasonable. Additionally, the Appellate Court found that the deference was owed to trial court's determination that the jurors were credible when they stated that they could reach a decision based solely on the evidence, and that nothing occurred that would prevent them from being fair and impartial. Here, the Appellate Division's determination that the trial court's actions fell within the wide discretion afforded to it in assessing the juror's possible impartiality was consistent with, and a reasonable application of, the aforementioned law. *See Mu'Min*, 500 U.S. at 427. Therefore, the Court denies habeas relief on Ground Five of the petition.

### F.  Admission of Reeves' Street Name (Ground Six)

In his sixth ground for relief, Petitioner asserts that the trial court erred in admitting evidence of his street name, Kaoz, into evidence during his trial. (ECF No. 1 at 22–23.) The Appellate Division rejected this claim on direct appeal finding that although state law permits the admission of such aliases only when relevant, Petitioner's street name was highly relevant as it was interwoven throughout the evidence in this matter—the name was recorded in various tape

recordings of phone conversations introduced at trial, several witnesses knew and referred to Petitioner by his street name, and Petitioner himself used the street names of other individuals in his own testimony. *Reeves*, No. A-4100-09T1, slip op. at 105–06. The Appellate Division also found that the admission of the evidence was not unduly prejudicial, and that any prejudice was undercut by Petitioner's admission to being a member of the Bloods gang, Petitioner admitted involvement in the killing of Vazquez, and the trial judge's limiting instruction that jurors should not consider the aliases as evidence of guilt or a propensity for criminal conduct. *Id.* at 106–07.

Because "[t]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," *see Marshall*, 459 U.S. at 438 n.6 (1983), claims challenging the admissibility of testimony or other evidence are normally considered questions of state law which are not cognizable in habeas corpus. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); s*ee also Estelle v. McGuire*, 502 U.S. 62, 67–70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213–14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary ruling only where he can show that the admission of the evidence at issue denied him due process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair; it need not have been perfect."

*Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a due process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994)).

Here, Petitioner cannot show that the admission of his street alias denied him a fundamentally fair trial. As noted by the Appellate Division, Petitioner's street name was interwoven throughout the evidence at trial – it was how he was known to several witnesses, and was contained in the recorded phone conversations. Likewise, the prejudicial impact of the use of his street name was also quite limited in light of the trial court's jury instructions and Petitioner's own admissions to both being a member of the Bloods gang and to having been involved in the killing of Vazquez. Because the street name was quite relevant to the evidence in Petitioner's case, and the prejudicial impact of its admission was minimal in light of the facts and limiting instruction, Petitioner cannot show that the admission of his street name into evidence denied him a fundamentally fair trial. The Appellate Division's rejection of the street name claim was thus neither contrary to nor an unreasonable application of applicable federal law. Therefore, the Court denies relief on Ground Six of the petition.

### G.  Ineffective Assistance of Counsel (Ground Seven)

In Ground Seven, Petitioner asserts ineffective assistance of trial counsel because: (A) counsel directed Petitioner to confess to the crimes charged at a pre-trial conference during jury selection; (B) he failed to move for a mistrial after it was discovered that a juror investigated verbiage referenced at trial during jury deliberations and thereby contaminated the entire panel

with her findings; and (C) counsel failed to request the trial judge's recusal for throwing Petitioner out of a youth program. (ECF No. 1 at 24–27.)

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id*. at 687. To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In analyzing counsel's performance, the court must be "highly deferential." *Id.* at 689. The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment. *Strickland*, 466 U.S. at 690. The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance." *Id.* It follows that counsel cannot be ineffective for declining to raise a meritless issue. *Premo v. Moore*, 562 U.S. 115, 124 (2011).

The second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable." 466 U.S. at 687. To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, as a petitioner must prove both prongs to establish an ineffectiveness claim. *Id.* at 697. Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" *See Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); *see also Cullen*, 563 U.S. at 190 ("[R]eview of the [state] Supreme Court's decision is thus doubly deferential."); *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard . . . ."); *Yarborough v. Genrty*, 541 U.S. at 1, 6 (2003) ("Judicial review of a defense attorney . . . is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas."). Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *Bond*, 539 F.3d at 289–90. These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen*, 563 U.S. at 187.

Here, Petitioner raised his ineffectiveness claims in the PCR proceeding, and the PCR court issued a detailed opinion denying the claims as meritless. (*See* ECF No. 11-31 at 36, 66–67, 70–72.) Petitioner appealed, and the Appellate Division affirmed the PCR court's decision and denied the claims. *Scott*, 2019 WL 3811913 at *8–10. The Appellate Division's opinion is the last reasoned state court decision. It rejected Petitioner's ineffectiveness claims based on either the performance or the prejudice prongs of *Strickland. Id.* Because it applied the correct two-prong standard announced in *Strickland* for analysis of Petitioner's ineffective assistance of counsel claims, the only questions on habeas review are whether the Appellate Division's application of the *Strickland* prongs was unreasonable and whether its ruling was based on an unreasonable determination of the facts. The Court concludes that its decision was neither an unreasonable application of clearly established federal law nor based on an unreasonable factual determination.

### 1. Ground Seven, Subpart A

In its opinion affirming the PCR court's decision, the Appellate Division rejected Petitioner's ineffectiveness claim regarding his alleged confession during jury selection under the performance prong of *Strickland*:

> Reeves complains that at a pre-trial proceeding, his attorney required him to confess to shooting Vasquez, that he was not told about his right to remain silent, and he felt compelled to testify at trial because he already had confessed. . . .
>
> During jury selection, Reeves raised the defense of duress for the first time. The trial judge permitted Reeves to advance this defense, over the State's objection, even though it was asserted well after the time allowed by the Rules. *See R.* 3:12–1 (requiring a defendant to notify the State "[n]o later than seven days before the Initial Case Disposition Conference" if asserting the defense of duress under

N.J.S.A. 2C:2-9(a)). The State suggested Reeves make a proffer to the court in support of this defense to address its need for discovery. Reeves acknowledged that he understood that this defense would include his acknowledgement that he fired the shots. There is no indication he was required to confess.

The issue in *In re Mandell*, 250 N.J. Super. 125 (App. Div. 2009), cited by defendant, is inapposite. The issue in *Mandell* was whether an attorney could be punished for contempt by not revealing prior to trial whether her client would testify at trial. We noted that "a defendant is not obligated to give the State advance notice of intention to testify or not testify" and that "[t]he State was not entitled to that information until it rested." *Id.* at 131. *Mandell* did not address whether defendant's pre-trial proffer could be used at trial.

Before Reeves testified at the trial, he acknowledged to the trial judge he was aware he had the right not to testify. There was no discussion that his pre-trial proffer would be used against him if he did not testify. We agree with the PCR court that Reeves did not show his attorney's performance on this issue was below an objective standard of professional performance. Reeves was not forced to make the proffer and had the choice whether to testify at trial.

*Scott*, 2019 WL 3811913 at *8–9.

The Appellate Division did not unreasonably apply clearly established federal law or unreasonably determine the facts in light of the evidence presented in the state court proceedings. As the Appellate Division noted, Petitioner had a choice whether to testify at trial, and he acknowledged on the record before testifying that he was aware he had the right not to testify. *Id.;* (ECF No. 11-3 at 9:4–6.) In fact, "[t]here was no discussion that his pre-trial proffer would be used against him if he did not testify." *Scott*, 2019 WL 3811913 at *9. The proffer was never introduced into evidence in the case-in-chief, and there was no indication that the State would have been permitted to introduce it if Petitioner had exercised his right not to offer testimony. (*See* ECF No. 11-31 at 70.) Because Petitioner's pre-trial statement to the trial court was not (and could not have been) used against him if he had subsequently chosen not to testify, the Appellate Division reasonably applied the performance prong of *Strickland* to conclude that counsel's strategy to

pursue an untimely duress defense by having his client make a proffer in support of this defense to the trial judge was not objectively unreasonable. *See, e.g.*, *Woods*, 575 U.S. at 316 (noting that federal review of ineffectiveness claim decided by state courts is doubly deferential).

Accordingly, Ground Seven, subpart A, does not provide a basis for habeas relief.

### 2.  Ground Seven, Subpart B

In Ground Seven, subpart B, Petitioner asserts that his trial counsel provided ineffective assistance by failing to move for a mistrial after it was discovered that a juror (Juror 12) investigated gang-related terms during deliberations and spoke about what she learned with the other jurors. (ECF No. 1 at 26.) The Appellate Division rejected this claim on the grounds that Petitioner's claim was procedurally barred under state law and that he failed to establish prejudice under *Strickland*:

> Reeves argues he should have had an evidentiary hearing on whether his attorney was ineffective because his attorney did not ask for a mistrial based on juror misconduct or ask to have that juror removed, nor did the attorney consult with him regarding those issues. During deliberations, one of the jurors passed a note that said another juror conducted research on the internet about gangs and shared that information with other jurors. This was done despite the trial court's repeated instruction to the jurors not to conduct their own research. The court interviewed the two jurors and conducted voir dire of the remaining jurors. Although not all the jurors were aware of the research,
>
> > [a]ll the jurors told the court that they could disregard the information obtained from the internet, that they could reach a decision based solely on the evidence, and that nothing occurred that would prevent them from being fair and impartial.  The court instructed them not to discuss the matter further.
>
> [*Reeves*, No. A-4100-09T1, slip op. at 86.]
>
> We agree with the PCR court that Reeves' claim is procedurally barred by Rule 3:22-5, which precludes Reeves from seeking post-trial relief on the same issue previously adjudicated. *See* [*State v. Preciose*, 129 N.J. 451, 476 (1992)] (citing R. 3:22-5) (providing that "a prior adjudication on the merits ordinarily constitutes a

> procedural bar to the reassertion of the same ground as a basis for post-conviction relief"). Issues that are "identical or substantively equivalent" to issues previously adjudicated will similarly be precluded. [*State v. McQuaid*, 147 N.J. 464, 484 (1997)] (citing [*Picard v. O'Connor*, 404 U.S. 270, 276-77 (1971)]; [*State v. Bontempo*, 170 N.J. Super. 220, 234 (App. Div. 1979)]. We rejected Reeves' claim in his direct appeal that this issue warranted reversal of his conviction based on plain error. [*Russel*, No. A-4101-09T1, slip op. at 86-87.]
>
> Reeves also did not satisfy the second part of *Strickland* that required him to show the result of the proceeding would be different but for his counsel's ineffective assistance. Each of the jurors answered the trial court that they could disregard the information and would decide the case based on the evidence. Reeves acknowledged he shot Vasquez and there was other corroborating testimony.

*Scott*, 2019 WL 3811913 at *9.

Petitioner asserts that his trial counsel was ineffective because he failed to consult with him regarding the juror's conduct and did not move for a mistrial, or, at a minimum, request the removal of Juror 12. (ECF No. 1 at 24, 26.) The Court concludes that the Appellate Division reasonably applied *Strickland*'s prejudice prong to find that Petitioner failed to show that the result of the proceeding would have been any different but for his counsel's allegedly deficient performance. Likewise, its ruling was not based on an unreasonable determination of the facts.[3]

This Court has concluded, with respect to Ground Five of the petition, that the Appellate Division reasonably applied clearly established law in determining the juror's internet research on gang terminology did not deprive Petitioner of a fair trial. *See supra* Section IV(E). As the

---

[3] The Court does not consider whether Ground Seven, subpart B, is procedurally defaulted based on the Appellate Division's "procedural bar" ruling because it concludes that the claim must be denied on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here")

Appellate Division observed in disposing of this related claim, "each of the jurors answered the trial court that they could disregard the information and would decide the case based on the evidence." *Scott*, 2019 WL 3811913 at *9. On direct appeal, the Appellate Division concluded that, "considering the swift and entirely appropriate involvement by the trial court, any error [with respect to the juror's internet research] was harmless and does not warrant reversal." *Reeves*, No. A-4100-09T1, slip op. at 86 (citing *State v. Sowell*, 213 N.J. 89, 97 (2013)) *see also, e.g.*, *Mu'Min*, 500 U.S. at 427 (stating that district courts have "wide discretion . . . [in] areas of inquiry that might tend to show juror bias"). "The Court cannot find trial counsel was ineffective for failing to raise a claim that the state court has found to be meritless." *Vaughn v. Ricci*, No. 10-1397, 2024 WL 1366482, at *13 (D.N.J. Apr. 1, 2024) (citing *Parrish v. Fulcomer*, 150 F.3d 326, 328 (3d Cir. 1998)), *appeal filed* (3d Cir. May 3, 2024).

The Appellate Division also deferred to the PCR court's finding that "the jurors exposed to the outside information were credible." *Reeves*, No. A-4100-09T1, slip op. at 87. Petitioner claims that Juror 12 lied to the trial court about the extent of her investigative research by failing to admit that she searched and told the other jurors about her findings regarding "the fate of gangster Monster Piru, who was killed in jail" and "information related to the Bloods gang." (ECF No. 1 at 26 (citing ECF No. 11-8 at 18:11–19:6, 23:20).) But the PCR court's factual findings are entitled to a presumption of correctness, and its credibility determinations are reviewed for their reasonableness. 28 U.S.C. § 2254(e)(1); *Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012). Petitioner failed to rebut the trial court's findings or undermine the reasonableness of its credibility assessment. The Appellate Division specifically acknowledged that one juror heard something about "Master Ru," and, in any event, all of the jurors informed the trial judge that they were able to ignore this information and render their verdict based solely on the evidence presented

at the trial. *Reeves*, No. A-4100-09T1, slip op. at 87; (ECF No. 11-8 at 16:19–20:8, 22:6–15, 28:13–45:3.)

Additionally, the Appellate Division noted that the "[Petitioner] acknowledged he shot Vasquez and there was other corroborating testimony." *Scott*, 2019 WL 3811913 at *9. Petitioner testified at trial that he was ordered to kill a witness, and he admitted to shooting Vazquez, who he mistook for the witness (Granados). (ECF No. 11-4 at 11:6–16, 13:25–14:1, 21:19–22:8.) Witnesses testified that Petitioner wanted to attain a higher rank within the gang by killing Granados. (ECF No. 10-20 at 11:15–21, ECF No. 11-4 at 108:1–8.) The jury also heard testimony that, before the murder, Petitioner told others he intended to kill the witness, and, after the murder he told others he committed the murder, but he never told them he was being forced to do so under threat of death. (ECF No. 11-4 at 23:16–20, 26:2–20.) Given the evidence of guilt presented against Petitioner, it was reasonable under *Strickland* for the Appellate Division to determine that Petitioner failed to establish that the result of the proceeding would be different but for his counsel's alleged ineffective assistance with respect to juror misconduct.

Because the Appellate Division's decision was neither an unreasonable application of clearly established federal law, nor based on an unreasonable factual determination, the Court concludes that Ground Seven, subpart B is without merit.

### 3. Ground Seven, Subpart C

The Appellate Division rejected Petitioner's claim of ineffective assistance of counsel with respect to the trial judge's alleged bias:

> Reeves also claimed ineffective assistance of counsel because his attorney did not request the trial judge to disqualify himself. Prior to jury selection, the trial judge advised the parties by letter, [that] he had been informed that Reeves previously was a participant in a community-based mentoring program called Omega XIII. The trial judge had been involved in that program since the mid-1980s, but

had no "independent recollection" that Reeves was a participant. The letter said he kept a distance from the participants as a whole and would recuse himself and leave if they discussed particular criminal cases. At some point, Reeves left the program. The trial judge advised he did not see a basis for disqualification, but asked counsel for their position on that issue. Reeve's [sic] counsel subsequently informed the court that he had spoken with his client and "[f]or the record, he does remember you, and has no objection to you remaining as judge in this case."

Six years later in his PCR petition, Reeves claimed for the first time that the trial judge expelled him from the Omega XIII program, and told him not to return because he was a "bad influence." He contends he told his trial counsel this. Reeves also alleges that as part of the program, he interacted with the trial judge on multiple occasions including going to a NCAA game and a banquet. He said the judge spoke to his mother. The trial judge's answers to interrogatories said he had no recollection of any of these events.

We agree with the PCR court that this did not warrant PCR relief or an evidentiary hearing. Reeves' counsel indicated that he had spoken with Reeves who had no objection to the trial court continuing to hear the case. Reeves' [sic] admitted shooting Vasquez. Numerous other witnesses implicated Reeves in Vasquez's shooting. There was no reasonable probability that the result of the proceeding would be different given the evidence.

Reeves argues on appeal that the trial judge showed bias by ruling against him on motions. He certainly had the opportunity to raise this issue in his direct appeal and did not. In his PCR petition he provided no substance to support his claim. The fact that rulings were adverse did not make them wrong or biased. We agree with the PCR court that Reeves simply did not show that his fair trial rights were violated when the trial judge did not disqualify himself for a conflict based on his involvement with the Omega XIII program. We are satisfied as well that the trial judge's participation in the program would not cause a reasonable, informed person to have doubts about the judge's impartiality nor that Reeves' fair trial rights were violated.

*Scott*, 2019 WL 3811913 at *10.

Petitioner argues that the Appellate Division's decision was an unreasonable application, of clearly established federal law. (ECF No. 1 at 26.) He further asserts that his trial counsel made no effort to discuss the youth program matter with him. (*Id.*) According to Petitioner, he is entitled

to an evidentiary hearing because, while he certified that the trial judge expelled him from the program because he was arrested and spent time in a youth house, the trial judge submitted a conflicting certification denying his factual allegations. (*Id.*) Petitioner further notes that, although the trial judge denied his youth program allegations, he also denied having prosecuted Baker, and it is now established that he prosecuted Baker on at least nine occasions.[4] (*Id.*)

The Court concludes that the Appellate Division's ruling rejecting this ineffectiveness claim was not an unreasonable application of *Strickland.* As the Appellate court observed, Petitioner's trial counsel indicated on the record that he had spoken with his client about the trial judge's participation in the youth program and that Petitioner had no objection to the trial judge continuing to hear the case. *Scott*, 2019 WL 3811913 at *10; (ECF No. 10-3 at 5:13–16.) Furthermore, Petitioner admitted shooting Vazquez, and there is other evidence implicating him in the murder. (*See, e.g.*, ECF No. 10-20 at 11:15-21, ECF No. 11-4 at 11:6–16, 13:25–14:1, 23:16– 20, 26:2–20, 108:1–8.) Accordingly, the Appellate Division reasonably applied *Strickland*'s prejudice requirement to conclude that Petitioner failed to establish a reasonable probability that the result would have been different if his counsel had requested recusal based on Petitioner's and the trial judge's prior involvement in the youth program.

It was also reasonable for the Appellate Division to indicate that any recusal request would have been without merit because "the trial judge's participation in the program would not cause a reasonable, informed person to have doubts about the judge's impartiality nor that Reeves's fair trial rights were violated." *Scott*, 2019 WL 3811913 at *10; *see also, e.g.*, *Vaughn*, 2024 WL

---

[4] Although he attempts to use the trial judge's prior Baker prosecutions to undermine the credibility of the trial judge's denials of his youth group allegations, Petitioner does not claim that his trial counsel provided ineffective assistance of counsel because he failed to file a recusal motion based on these prior prosecutions. The Court considers Petitioner's claim (Ground Eight) that the trial judge was required to disqualify himself because he previous prosecuted Baker in the next section, *see infra* Section III(H).

1366482, at *13 (stating that trial counsel cannot be found ineffective for failing to raise meritless claim); *State v. Presley*, 436 N.J. Super. 440, 448 (App. Div. 2014) ("The [New Jersey] Supreme Court has distilled these principles to this question: 'Would a reasonable, fully informed person have doubts about the judge's impartiality?'") (citing *DeNike v. Cupo*, 196 N.J. 502, 517 (2008)). In his habeas petition, Petitioner does not identify any specific ruling by the trial judge constituting proof of his alleged bias against Petitioner.

Finally, Petitioner failed to demonstrate that the Appellate Division's decision was based on an unreasonable determination of the fact under 28 U.S.C. § 2254(d)(2). The state courts credited trial counsel's statement on the record that "I've spoken with Mr. Reeves, Your Honor. For the record, he does remember you and he has no objection to you remaining as judge in this case" and that the trial judge's certified statements that he "did not recall throwing Lee Reeves out of the Omega XIII Mentorship Program in 2005;" did not recall speaking with his mother; did not remember ever personally counseling Petitioner; and did not recall ever bringing him to a banquet, seminar, or basketball game. (ECF No. 11-31 at 68–69 (quoting ECF No. 10-3 at 5:13–16; ECF No. 11-31 at 80–81)); *see also Scott*, 2019 WL 3811913 at *10. The state court findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and Petitioner fails to overcome that presumption with clear and convincing evidence. In addition, Petitioner is not eligible for an evidentiary hearing because deferential review under § 2254(d) is limited to the record that was before the state courts that adjudicated the claim on its merits. § 2254(d)(2) (stating that writ shall not be granted with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision based on an unreasonable determination of the facts "in light of the evidence presented in the State court proceeding"); *Nobles v. Davis*, No. 19-10607, 2022 WL 861850, at *3 (D.N.J. Mar. 23, 2022) ("Review under § 2254(d)(1) is

limited to the record that was before the state court that adjudicated the claim on the merits." (citing *Cullen*, 563 U.S. at 180–81)). Accordingly, habeas relief will be denied on Ground Seven, subpart C, of the petition.

The Court denies relief on Ground Seven in its entirety.

### H. Due Process Violation Based on the Trial Judge's Prosecution of Tyleek Baker (Ground Eight)

In his eighth ground for relief, Petitioner contends that he was denied due process because his trial judge had previously prosecuted Tyleek Baker, the defendant in a related criminal matter, the facts of which were admitted into evidence in Petitioner's own trial. (ECF No. 1 at 28–29.) The PCR court found that the trial judge was an assistant prosecutor between 1988 and 1999. (ECF No. 11-32 at 11.) During that time, he handled hundreds of cases, which included some involvement, either directly or as a supervisor, in several juvenile prosecutions of Baker. (*Id.*) The trial judge affirmed, in his written responses to questions submitted to him, that he had been unaware of his involvement in Baker's juvenile matters at the time of Baker's trial, that he was never informed of the issue prior to trial, and that he would have transferred Baker's case had he been informed. (*Id.*)

During PCR proceedings, Petitioner asserted that the trial judge should have been disqualified from overseeing his trial because he had a conflict with Baker, who, though not a defendant in Petitioner's case, was the defendant in a directly related matter, which was discussed at Petitioner's trial. The Appellate Division ultimately rejected this claim, finding that "a disqualifying conflict as to one defendant is an insufficient basis for the other defendants to seek nullification of orders entered by the judge in the absence of constitutional defect." (ECF No. 11-32 at 30.) Thus, even assuming a conflict with Baker, the Appellate Division found that conflict could not be imputed from Baker to Petitioner, that Petitioner had not shown any evidence of bias

43

towards him, and the Baker-conflict issue was no basis for a finding of a due process violation as to Petitioner. (*Id.*) The Appellate Division also found the conflict with Baker insufficient to require overturning Baker's own separate conviction as there was no evidence of bias, the alleged conflict was first raised *after* Baker's trial, the record indicated that the trial judge was unaware of the conflict in any event, and the totality of the facts, therefore, were not sufficient to suggest that the trial judge's presiding over Baker's trial was sufficient to erode public confidence in the integrity and impartiality of the judiciary. (*Id.* at 24.)

Although it is "axiomatic that [a] fair trial in a fair tribunal is a basic requirement of due process[,] . . . most matters relating to judicial disqualification [do] not rise to a constitutional level." *Caperton v. A.T. Massey Coal Co.,* 556 U.S. 868, 876 (2009) (internal citations and quotations omitted). The Due Process Clause will only require the disqualification of a trial judge under certain limited sets of circumstances including where the judge has "a direct, personal, substantial, pecuniary interest in a case," and where a judge has a conflict arising out of "his participation in an earlier proceeding" and that prior involvement, such as where the judge charges a defendant with criminal contempt, ensures that the judge "cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of the accused." *Id.* at 876–81. Where a claim of this second type is raised, the inquiry involved is objective—the question is not whether the judge "is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* at 881. A Due Process violation will only be found where the judge "would have been required to recuse herself." *McKernan v. Superintendent Smithfield SCI*, 849 F.3d 557, 565 n.44 (3d Cir. 2017).

The Appellate Division's decision rejecting Petitioner's claim was neither contrary to nor an unreasonable application of state law. Petitioner has not identified an actual conflict as to

himself, instead he identified only an alleged conflict with a defendant in a separate, albeit, related criminal case,[5] has presented no clear evidence of bias, and has made no showing that the judge's impartiality as to Petitioner should be called into question based on the apparent conflict with Baker. Petitioner has thus not provided evidence that his trial judge had a prior history with Petitioner sufficient to indicate that he "cannot be . . . wholly disinterested in the conviction or acquittal of" Petitioner, and thus has not shown that the disqualification of the judge was warranted under applicable Supreme Court precedent. *See Caperton*, 556 U.S. at 876–77; *see also Rippo v. Baker*, 580 U.S. 285, 287 (2017) (recusal is required only "when, objectively speaking, the probability of actual bias on the part of the judge . . . is too high to be constitutionally tolerable"). Based on the record before the Court, the Appellate Division's decision was thus a reasonable application of federal law. Therefore, habeas relief will be denied on Ground Eight of the petition.

## I. *Brady* Claim (Ground Nine)

In Ground Nine of his petition, Petitioner asserts a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), because the State failed to disclose: (1) a letter sent from Powell to the trial judge on February 2, 2009, and (2) Devon Hardy's affidavit, which corroborated Powell's letter. (ECF No. 1 at 31–32.) Petitioner raised this claim for the first time in his PCR petition, because his Appellate counsel refused to advance the claim on direct appeal. According to Petitioner, Powell claimed in his letter to the trial judge that he was not involved in the attempted shooting of the witness to the barbershop murder, and Powell learned of who was involved in the murder only after he was incarcerated in Ocean County Jail. Petitioner contends this was contradictory to

---

[5] Petitioner does not attempt to incorporate his claim, discussed as part of Petitioner's ineffective assistance of counsel claims, related to the judge's involvement in the Omega XIII youth program in this ground for relief.

Powell's testimony and could have been used to damage his credibility. If Powell's letter was true, Petitioner submits Powell had no relevant information about the crime charged.

Petitioner claims that Devon Hardy's Affidavit would also have been helpful to Petitioner's defense. Hardy affirmed he was in Ocean County Jail with Powell. Powell told Hardy he would fabricate anything for the prosecutors in exchange for a reduced sentence, and the prosecutors would not know he was lying. This corroborated Powell's letter by establishing his testimony was fabricated to obtain a favorable plea deal. Petitioner was not afforded an evidentiary hearing on this issue in the PCR court.

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87). In *Strickler*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. at 281–82.

The Appellate Division denied this claim on PCR appeal as follows:

> Reeves argues the PCR court erred by denying his petition because the State withheld exculpatory evidence in violation of *Brady*. He claims he did not have a copy of a letter from Powell or of an affidavit from Hardy. Powell's undated letter was written to a different Superior Court judge, and professed Powell's innocence of the charges then pending against him and offered to cooperate. The letter did not reference Reeves or Scott or reveal any information about their participation in the death of Vasquez. Hardy's affidavit, dated August 4, 2009, said that Powell would do anything to help himself, including "lie on other inmates." However, the jurat dated in 2008 raised issues about the affidavit's authenticity.

46

The PCR court correctly rejected Reeves' request for an evidentiary hearing. Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To show entitlement to relief under *Brady*, a "defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material." *State v. Martini*, 160 N.J. 248, 268-69 (1999) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)). There must be some knowledge by the State regarding the evidence at issue. *United States v. Agurs*, 427 U.S. 97, 103 (1976). "[T]he contested evidence must at least be 'in [the prosecutor's] file.'" *State v. Carter*, 85 N.J. 300, 313 (1981) (second alteration in original) (citing *Agurs*, 427 U.S. at 110).

Reeves did not show proof that the Powell letter or Hardy affidavit were in the State's possession or that it was even aware of them. It is not clear whether the Hardy affidavit was authentic based on its dates.

Neither the letter nor affidavit was material, meaning "whether there is 'a reasonable probability' that if the evidence had been disclosed 'the result of the proceeding would have been different.'" *State v. Mustaro*, 411 N.J. Super. 91, 101 (App. Div. 2009) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Powell was attesting to his innocence in his letter, not to Reeves'. Powell was cross-examined at trial about the claim in Hardy's affidavit that he was lying. Therefore, the affidavit added nothing new on the credibility issue.

*Scott*, 2019 WL 3811913 at *10–11.

The Appellate Division's decision rejecting Petitioner's claim was neither contrary to nor an unreasonable application of state law. The record shows Joseph Powell sent the following letter to The Honorable Francis R. Hodgson, postmarked February 2, 2009. The letter states, in relevant part:

Dear Judge Honorable Frances R. Hodson,

My name is Joseph Powell. I am currently being held at the Ocean County Jail for the murder of a witness in last years' barber shop murder trial. I was a part of a phone conversation with two guys that are codefendants of mine in their case. I had no idea what message they wanted me to deliver to another guy that is involved.  Since I

been locked up I am aware of who played what parts in the murder. I am aware what my phone conversation may have seemed like with these guys but I honestly did not nor did I have the intention to deliver a message to have anyone killed. They did not explain to me about no witness at all. That plan was talked about prior to that phone call and did not include me. I was willing to work with the prosecutor's office 100% the day after my arrest. I was willing to wear a wire around every member involved in the case to find out everyone's involvement. I played no part in this killing. . . . I offered to testify to everything I found out since my arrest and I'm still willing . . . .

(ECF No. 11-30 at 16–18.) In his affidavit, purportedly of August 2009, Devon Hardy stated he was Powell's roommate during the pending Vazquez murder trial and they had conversations about Powell's willingness to lie to the prosecutors to secure his own release. (ECF No. 11-30 at 22.)

"[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell,* 556 U.S. 449, 469–470 (2009)). A reasonable probability means "that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." *Id.* at 75–76 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted)).

According to the findings of fact by the Appellate Division on direct appeal, Petitioner testified at his trial and admitted to killing Vazquez in a botched attempt to kill a witness to the barbershop murder, at Powell's command. Petitioner, however, admitted that he told others, who testified accordingly, that he had acted on Scott's command, not Powell's, which is consistent with Powell's claim of innocence. It is not clear how Powell's letter or Hardy's corroborating affidavit would call into doubt Petitioner's confession. Moreover, evidence corroborated Petitioner's confession. In particular, Petitioner's girlfriend Foskey, to whom Petitioner confessed his attempt to kill a witness and his mistaken murder of the wrong person, led police to the location of a shell casing Petitioner had shown her. The casing was forensically linked to a casing found at the murder

scene. Based on the evidence at trial leading to Petitioner's conviction, the Appellate Division's denial of the *Brady* claim involved a reasonable application of federal law. Therefore, the Court denies relief on Ground Nine of the petition.

## IV.    **CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has failed to make a substantial showing of the denial of a constitutional right and a certificate of appealability is therefore denied.

## V.    **CONCLUSION**

For reasons explained in this Opinion, the Court denies the § 2254 habeas petition and also denies a certificate of appealability. An appropriate Order follows.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: September 27, 2024.

49